UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

RHONDA F.,                                    :
          Plaintiff,                          :
                                              :
          v.                                  :          C.A. No. 19-401JJM
                                              :
ANDREW M. SAUL,                               :
COMMISSIONER OF SOCIAL SECURITY,              :
          Defendant.                          :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On March 21, 2018, Plaintiff Rhonda F. applied for Disability Insurance Benefits

("DIB") under 42 U.S.C. § 405(g) of the Social Security Act (the "Act").  Her application alleges

that an array of physical and mental impairments forced her to leave the work she had done for

most of her adult life (as a teaching assistant for the Warwick school system) on October 1,

2017, when she was fifty-one years old; she asserts that she is disabled due to the limiting effects

of bilateral carpal tunnel syndrome, rheumatoid arthritis, neuropathy, fibromyalgia, Crohn's

disease, GERD, anxiety and depression.

In this Court, Plaintiff has raised a plethora of challenges, but her primary contentions are

that (1) the Administrative Law Judge ("ALJ") erred in basing his residual functional capacity

("RFC")[1] finding on the opinions of the state agency ("SA") non-examining physicians, Dr.

Ricardo Ramirez and Dr. Darrin Campo, because the medical evidence does not support their

conclusion that she was capable of medium work with additional limitations; (2) the ALJ erred in

rejecting as unpersuasive the opinion of her treating nurse practitioner, Nurse Practitioner Joanne

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

Lowney; and (3) the ALJ improperly impugned Plaintiff's character by failing to accept and rely on her subjective statements regarding the severity of her symptoms. Plaintiff has asked the Court to remand the matter for an award of benefits; alternatively, she asks for remand to a different ALJ because, she claims, the incumbent, ALJ Mastrangelo, acted with bias when he "nefarious[ly]" suggested that she was lying. Defendant Andrew M. Saul ("Defendant") has moved for an order affirming the Commissioner's decision. The matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

Having carefully reviewed the record, I find that the ALJ's findings are consistent with applicable law and amply supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 15) be DENIED and Defendant's Motion for Entry of an Order Affirming the Decision of the Commissioner (ECF No. 16) be GRANTED.

## I.   Background

### A.   Plaintiff's Subjective Complaints

Plaintiff's treating medical record is replete with her subjective statements to providers describing severe and disabling symptoms, including burning and stabbing pain in all extremities, feelings of imbalance, hair and weight loss, headaches, fatigue, stiff neck, sustained high fevers, night sweats, chest pain, shortness of breath, leg cramping, difficulty walking due to leg weakness and numbness, anxiety and depression. Some of these complaints were never confirmed by examination; for example, Plaintiff reported a very troubling protracted pattern of high fevers, yet no examining provider ever recorded or observed a fever. Others were contradicted by diagnostic testing or examination. For example, Plaintiff's complaint of leg

weakness and lower extremity neuropathy was not confirmed by clinical testing; similarly, examination based on Plaintiff's complaint of neck stiffness did not yield any finding of clinically significant stiffness in the neck.  Still other complaints suggested conditions that were ruled out by objective testing; these include rheumatoid arthritis, lupus, scleroderma, any other connective tissue disease, Lyme disease and cardiac disease.  And others were well founded, resulting in the diagnoses of bilateral carpal tunnel syndrome, anxiety, depression and PTSD that the ALJ found to be severe impairments.  The record also reflects that, prior to the period in issue, Plaintiff had been diagnosed with fibromyalgia, Crohn's disease, migraines and GERD. However, for the period in issue, there is limited evidence either to confirm these diagnoses or to reflect treatment related to these impairments.  For example, as the ALJ correctly found, fibromyalgia is noted by virtually every treating source as a "past" or "remote" diagnosis; while some questioned or assumed that it potentially was ongoing, no treating source diagnosed it during the period in issue.  E.g., Tr. 264 ("Past Medical History" includes fibromyalgia); Tr. 386 ("She has remote history of fibromyalgia."); Tr. 394 ("Fibromyalgia is on the differential.").  The ALJ nevertheless accepted it as a non-severe impairment.  Tr. 15.

During the hearing, Plaintiff further described her symptoms, including that weakness in her legs causes her to fall at home three times every week; that she has headaches every day that are not migraines; that she also had seventeen migraines in the past month; that she sleeps no more than two hours a night; and that she has severe anxiety.  However, some of these complaints are missing from the treating record (e.g., falling three times a week).  Tr. 49-50, 53-54.  Regarding her capabilities, Plaintiff testified that she cannot sit for more than ten minutes, cannot stand for more than ten to fifteen minutes, cannot lift even a gallon of milk, cannot walk

more than half a block and has stopped driving both because of anxiety and because she often cannot pivot her foot to hit the pedals. Tr. 46-49.

Noting that "complaints alone do not equate to a finding of disability," Tr. 16, the ALJ concluded that, apart from bilateral carpal tunnel syndrome, Plaintiff's many complaints of severe physical symptoms are inconsistent with a medical record containing "[d]iagnostic imaging, radiological studies, and physical examination results [that] have routinely been either mild, moderate, or unremarkable." Tr. 20. Plaintiff's appeal asks this Court to find that this conclusion is tainted by error.

### B.    Plaintiff's Work and Health History

Plaintiff has an associate's degree in special education and worked for twenty years as a teacher's assistant. Tr. 38, 40. Her duties included feeding, toileting, "running after" and restraining disabled children. Tr. 41-43. When she was forty or forty-one, she was diagnosed with fibromyalgia and the larger children became too much for her to monitor; she was switched to working with younger children, which she did until she stopped work on October 1, 2017, when she was fifty-one. Tr. 41-44. As performed in the latter period, this work required the ability to function at least at the medium level of exertion. Tr. 56. After Plaintiff stopped work, she collected temporary disability insurance for a year. Tr. 40.

There are no medical records reflecting Plaintiff's symptoms, diagnoses or treatment leading up to the date (October 1, 2017) of alleged onset when she stopped working. Plaintiff later told the infectious disease specialist (Dr. Hadeel Zainah) that, beginning in June 2017, she had been having headaches and neck stiffness and that she had suffered from fevers up to "102 up to 104" during September, October and into November 2017. Tr. 384. During the hearing, Plaintiff explained that she stopped work because she could no longer restrain children, which

was an essential function of her job – "I feel it's the fibromyalgia, and the carpal tunnel with the arms, and I just can't walk or run like I used to be able to." Tr. 42-43.

The earliest treating record is from Nurse Practitioner Lowney, the nurse practitioner who acted as Plaintiff's primary care provider. At the first appointment of record, on October 19, 2017, Plaintiff complained only of a painful rash that had just started, which Nurse Practitioner Lowney tentatively diagnosed as herpes zoster (shingles); Plaintiff "also noted a headache." Tr. 352-53. Otherwise, Nurse Practitioner Lowney's examination was entirely normal. Tr. 352-55. There is no reference to a fever during the weeks leading up to this appointment and no indication that Nurse Practitioner Lowney's examination including taking a temperature. Nurse Practitioner Lowney prescribed medication (Valtrex) for shingles. Tr. 354. A week later (October 24, 2017), Plaintiff saw Nurse Practitioner Lowney a second time to follow up regarding shingles and anxiety. Tr. 356. For anxiety, Nurse Practitioner Lowney prescribed medication, "with good effect." Tr. 356. While the rash had not gotten worse, Plaintiff also complained of fatigue and headaches; for the latter, Nurse Practitioner Lowney prescribed no treatment because they were responding to Advil "with good effect." Id.

On November 7, 2017, Plaintiff returned to Nurse Practitioner Lowney, still complaining of the rash, as well as a stiff neck, and feeling unwell, anxious and weepy. Tr. 360. Nurse Practitioner Lowney continued her diagnoses of herpes zoster (shingles) and anxiety; however, her examination yielded entirely normal results. Tr. 361. There is no reference to any fever, chest pain or shortness of breath. There is no reference to any suggestion that Plaintiff should go to the emergency room.

On the same day as the appointment with Nurse Practitioner Lowney, Plaintiff went to the Rhode Island Hospital ("RIH") emergency room. Tr. 428-62. She told RIH providers there

that she had a "worsening rash" and symptoms (weight loss, hair loss and myalgia) that "been ongoing since August," as well as that she had developed chest pain and shortness of breath "while at her PCP's office today because she was very anxious, therefore was sent here." Tr. 432. Finding only elevated blood pressure, the rash, hair loss and anxiety, the RIH physician noted that chest pain and shortness of breath had resolved, that there was no fever, that range of motion was all normal with no pitting or edema, that the rash lesions "do not appear shingle-like," Tr. 433, and that the x-rays, EKG and laboratory tests results (including for Lyme disease) showed no acute abnormalities. Tr. 432-34, 441. Plaintiff was discharged by RIH the same day as "stable" with diagnoses of unspecified chest pain, rash and weakness; she was told to follow up with a dermatologist, rheumatologist and infectious disease specialist. Tr. 454-55.

On November 16, 2017, Plaintiff followed up with Dr. Hadeel Zainah, an infectious disease specialist who is affiliated with the Ambulatory Services Pavilion at Kent Hospital. 384-420. Plaintiff told Dr. Zainah that, since September, she had been having fevers of "102 up to 104," as well a rash, stiff neck, headaches and other symptoms; she reported that this headache "is not similar to her migraine that she used to have years ago." Tr. 384. Dr. Zainah noted fibromyalgia as "remote history." Tr. 386. On examination, Dr. Zainah found no edema or strength limits in the lower extremities; no "flank neck stiffness"; no strength limits in upper extremities, except for decreased sensation in the hands and some strength limitation in the left hand for gripping; no rash; no joint swelling; some imbalance; and some tenderness in the spine, left thigh and second finger of the hand. Tr. 388. There was no fever. Nevertheless, Dr. Zainah was very concerned by Plaintiff's description of the fever, as well as the other symptoms. Id. He ordered an array of tests and suggested that Plaintiff be admitted to the hospital to "get

6

worked up as an inpatient," Tr. 389, but she declined.  He directed Plaintiff to go to the

emergency room if the fever, neck stiffness and headache returned.  Tr. 389-90.

On the day following the initial appointment, Dr. Zainah followed up by phone; while his

note is partially obliterated, it reveals that Plaintiff told him that she had been exposed to a

pesticide since June 2017.  Tr. 391.  Dr. Zainah investigated this potential cause of Plaintiff's

reported symptoms; he concluded that, except for the resolved rash, "the symptoms she is having

are different" from what might be expected from exposure to the pesticide she named.  Id.  In a

subsequent note, he indicated that "when looked further, some studies reported immune disorders

from exposure to pyrethrin products, which could be relevant."  Id.  However, the record does

not reflect any follow-up on the latter possibility.

At the next appointment (on November 22, 2017), Dr. Zainah noted that the fever had

resolved, that Plaintiff had no frank neck stiffness, that "pesticide exposure does not explain the

clinical picture" except possibly for contact points on the skin, and that the headache was "much

better and improved," as well as that it is not "typical for migraine," but might be caused by

stress.  Tr. 393-94.  While Dr. Zainah observed tenderness all over and noted that both

fibromyalgia and malignancy are "on the differential," he did not diagnose either; further, there

is nothing in the record to suggest that Dr. Zainah made any material findings from any of the

many tests he had ordered.  E.g., Tr. 394 ("Workup was negative for HIV, RPR, blood culture,

UA, urine culture, index, parasite smear and PCR, ANA, ANCA,, RF, . . . . Chest x-ray in

lifespan was negative").  In late November and early December 2017, Dr. Zainah called Plaintiff

several times to check whether the fever recurred.  Tr. 397.  She reported that she had no fever,

no headaches, just "the diffuse soreness."  Id.  The last such contact appears to have been on

December 4, 2017.  Id.  After December 4, 2017, Plaintiff appears to have had no further contact with Dr. Zainah.  His records reflect no definitive diagnosis and no treatment.

After Plaintiff's first appointment with Dr. Zainah, Plaintiff went back to Nurse Practitioner Lowney.  Tr. 364.  At an appointment on November 28, 2017, Plaintiff reported to Nurse Practitioner Lowney that "she has been seeing an infectious disease specialist who has diagnosed her with toxic neuropathy," and that she was "having difficulty walking at times relating to the weakness in her legs."  Id.

In December 2017, Plaintiff began treatment at NeuroHealth.  At the initial appointment on December 14, 2017, with Nurse Practitioner Maria Silva,[2] Plaintiff reported headaches, joint pain, paresthesias and anxiety following the use of a pesticide from May to November 2017 on marijuana plants she and her husband were growing at home.  Tr. 264.  The NeuroHealth treating notes summarize the testing results and diagnoses of other providers including that "RIH . . . did not feel this was shingles" and that Dr. Zainah's "[e]xtensive lab work was negative," as well as that Dr. Zainah "[q]uestioned chemical neuropathy."  Id.  On examination, NeuroHealth notes reflect observations of anxiety, decreased sensation, reduced strength in upper and lower extremities, difficulty with tandem walking and positive Romberg sign.  Based on these observations and Plaintiff's reported symptoms, nerve studies and an MRI were ordered and Cymbalta was prescribed for fibromyalgia.  Tr. 265-66.  The testing was performed in January 2018.  The brain MRI came back entirely normal.  Tr. 269.  The EMG/NCV testing was done by Dr. Gary L'Europa, a neurologist with NeuroHealth.  The lower extremity testing yielded entirely normal results, as did some of the nerve studies for the upper extremities.  Tr. 257, 260.

---

[2] The record reflects that the appointment was with the nurse practitioner, but Dr. Keith Brecher signed the treating note for the appointment.  Tr. 264, 266.

However, the upper extremity EMG yielded abnormalities that resulted in Dr. L'Europa's diagnosis of bilateral carpal tunnel syndrome.  Id.

On February 6, 2018, Plaintiff returned to NeuroHealth to see Nurse Practitioner Silva. Other than unspecified weakness, all observations on examination were normal.  With listed assessments of paresthesia, fibromyalgia, myalgia, carpal tunnel syndrome and a question of "[t]oxic neuropathy" and whether going off medical marijuana since November may be a contributing factor to increase "Fibromyalgia pain," Nurse Silva decided to send Plaintiff to various specialists to evaluate these possibilities.  Tr. 258.  Apart from the prescription for Cymbalta and wrist splints for carpal tunnel, id., there is no evidence of treatment, including no suggestion of the need for more aggressive treatment for carpal tunnel.  After February 6, 2018, Plaintiff did not follow-up further with any NeuroHealth providers.

Meanwhile, in January and again in February 2018, Plaintiff was seen by Nurse Practitioner Lowney.  Tr. 290-97.  Based on Plaintiff's report, Nurse Practitioner Lowney recorded that Plaintiff was being followed by Dr. Brecher and Dr. L'Europa of NeuroHealth for toxic neuropathy.  Tr. 290, 294.  Nurse Practitioner Lowney's treatment plan for Plaintiff was for her to follow up with the specialists.  Tr. 291.  Both of Nurse Practitioner Lowney's own examinations were normal.  Tr. 291, 295.

The next specialist Plaintiff saw was Dr. Edward Reardon, a rheumatologist.  Tr. 281.  At an appointment on March 20, 2018, Dr. Reardon noted the diagnosis of carpal tunnel syndrome and Plaintiff's complaints of pain in multiple areas, raising concern of a rheumatic condition, rheumatoid arthritis or lupus.  Id.  Dr. Reardon noted signs consistent with carpal tunnel syndrome and bumpy nodes on Plaintiff's fingers, reduced spinal range of motion and "[c]repitus of the knees," but found "no objective evidence of rheumatoid arthritis or lupus, mixed

connective disease, scleroderma or other connective tissue disease." Tr. 282. Dr. Reardon's follow-up x-rays of the wrists, chest (including heart) and hands all yielded normal findings. Tr. 344-45. There is no indication that Plaintiff ever returned to Dr. Reardon. At the ALJ hearing, Plaintiff testified that Dr. Reardon was treating her for fibromyalgia, although his notes make no mention of such diagnosis or treatment. Tr. 44.

Plaintiff's last two appointments of record were with Nurse Practitioner Lowney, in April and May 2018. Tr. 376. Nurse Practitioner Lowney's notes reiterate that Plaintiff told her that she is "being followed by Dr L'Europa (neuro) R/T Toxic Neuropathy" and "is being followed by Dr. Edward Reardon (Rheumatology)." Tr. 376, 380. Both of Nurse Practitioner Lowney's examinations were normal; her treatment plan remained "continue follow up with specialist." Tr. 377; see Tr. 381 ("to follow up with specialists"). With respect to mental health treatment, Nurse Practitioner Lowney recorded her understanding that Plaintiff was seeing a "psych counselor," Tr. 380, and noted her recommendation that Plaintiff should continue to do so, Tr. 381. However, the only "psych counselor" who saw Plaintiff during the period in issue is the SA psychologist, Dr. Louis Turchetta, who performed the consultative examination in connection with her DIB application, Tr. 320, as Plaintiff confirmed during her testimony at the hearing.[3] Tr. 44.

Plaintiff's last treatment of record occurred on May 22, 2018. There is no treatment of any sort during the more than seven-month period between the last treating appointment and the ALJ hearing on January 3, 2019.

### C.    Opinion Evidence

---

[3] Plaintiff told the ALJ that she would like to treat with a psychiatrist or therapist once she had health benefits. Tr. 44.

The ALJ relied heavily on the opinions of the SA non-examining physicians (Drs. Ramirez and Campo) and the SA non-examining psychologists (Drs. Coyle and Hamel).

For physical impairments, Drs. Ramirez and Campo focused on the normal testing of Plaintiff's lower extremities, the normal brain MRI, the rheumatologist's finding of no objective evidence of rheumatoid arthritis or other autoimmune rheumatic impairments and the relatively benign wrist and hand x-rays; they noted the findings of decreased sensation and mildly decreased hand grip, and the tests resulting in the diagnosis of bilateral carpal tunnel syndrome. Tr. 68, 85-86.  Dr. Campo amplified on the initial determination by Dr. Ramirez:

> [T]here is electro-diagnostic evidence of bilateral CTS with notation of decreased sensation and mildly decreased hand grip with otherwise normal strength in the upper extremities and no evidence of thenar or hypo-thenar atrophy.  Initial determination is also supported by MER in that serial musculoskeletal examinations reveal tender points with no evidence of synovitis in the setting of a workup for connective tissue disease which was negative.

Tr. 86.  Based on this analysis, these physicians found that Plaintiff retained the RFC to lift occasionally fifty pounds, frequently twenty-five pounds, to stand, sit and walk for six hours out of a workday, to frequently climb ladders, ropes and scaffolds, with limitations on handling, and feeling and on exposure to certain environmental conditions.  Tr. 73-74.  Based on Plaintiff's activities of daily living, the location, duration, frequency and intensity of her pain and her other symptoms, as well as longitudinal treatment records, the disability determination explanations reflect the finding that Plaintiff's many statements about her condition were only partially consistent with the severity of her symptoms.  Tr. 72, 89.

The file that these SA physicians reviewed was incomplete in that it omitted the following treating medical records:[4]

---

[4] Importantly, these omitted materials are not post-file-review treating records.  Rather they are records of treatment performed during the same period covered by the treating records that were presented to the file-reviewing SA

- Nurse Practitioner Lowney's first treating note (October 19, 2017) reflecting that Plaintiff's only complaints were headache, treated with Advil "with good effect," and the rash, which subsequently resolved; except for the rash, Nurse Practitioner Lowney's examination was normal.  Tr. 352-55.

- Nurse Practitioner Lowney's last treating note (May 22, 2018) reflecting the same complaints that were listed at the April appointment (peripheral neuropathy, anxiety and fibromyalgia) with treatment limited to "follow up with" specialists and psych counseling; Nurse Practitioner Lowney's examination was normal.  Tr. 380-83.

- The records of Dr. Zainah (the infectious disease specialist) (November and December 2017) reflecting Plaintiff's complaint of a fever and stiff neck that was resolved or not detected, as well as Dr. Zainah's extensive testing, all of which was negative and none of which resulted in diagnosis or treatment.  Tr. 384-427.

- The RIH emergency room record (November 7, 2017) reflecting complaints (chest pain and shortness of breath) that were not detected by hospital staff, as well as findings of stable condition, that she did not appear to have shingles, with all tests and x-rays negative, including a normal examination except for the rash.  Tr. 428-62.

The ALJ carefully examined this evidence.  Based on his review, he found:

> [It] does not warrant a change in the pertinent findings of [the non-examining SA] doctors or the persuasiveness of their opinions.  The subsequent evidence is consistent with the evidence reviewed by these doctors in that the claimant remained . . . physically intact with only modest findings on physical . . . examinations.  There was no indication that the claimant's condition substantially worsened or that a new condition developed that would substantially alter the pertinent findings.

Tr. 22.

For mental health impairments, SA psychologist Dr. Turchetta performed a consultative examination report that formed the basis for the opinions of Drs. Coyle and Hamel that Plaintiff was moderately limited by anxiety, depression and PTSD.  Tr. 68-71, 74-76, 87-88, 89-91.

Several weeks before the ALJ hearing, Nurse Practitioner Lowney submitted four separate opinions, one each for mental limitations, physical limitations, pain and migraine.  Tr.

---

experts; for reasons not disclosed to the Court, they were not submitted with the other contemporaneous records. Nurse Practitioner Lowney's four opinions, discussed below, are the only post-file-review evidence.

331-39.  At the time she signed these opinions (on November 13, 2018), Nurse Practitioner

Lowney had not seen Plaintiff in almost six months.  Nurse Practitioner Lowney's mental health

opinion somewhat illogically found Plaintiff markedly limited in dealing with short and simple

instructions but only moderately limited in dealing with detailed instructions.  Otherwise,

consistent with the SA psychologists, Nurse Practitioner Lowney found only moderate

limitations, except that she opined to marked limits (with no explanation why) in the ability to

get along with coworkers, to dress neatly and appropriately[5] and to avoid hazards.  Tr. 331.  By

contrast, for physical and pain-affected functions, Nurse Practitioner Lowney found extreme

limits, including limits on seeing and hearing; for clinical support, her opinion relies exclusively

on the tests ordered by Dr. Zainah on November 16, 2017 (all of which were negative).  Tr. 336-

37.  Nurse Practitioner Lowney's migraine opinion states that Plaintiff gets three to six migraines

a week and that these would cause her to miss work more than four days a month but confirms

that Plaintiff had been receiving no treatment for migraines.  Tr. 339.

## II.    <u>Standard of Review</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v.</u>

<u>Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); <u>Rodriguez v.</u>

<u>Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Brown v. Apfel</u>, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

---

[5] For example, there is no record support for marked limitations in the ability to get along with coworkers or to dress neatly and appropriately.  <u>See, e.g.</u>, Tr. 321, 323 (claimant "lives with her husband who is supportive as is her son . . . has some friends but she is cautious of people . . . was able to establish rapport during this evaluation;" and claimant "was punctual . . . dressed in a casual manner and was neatly groomed").

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g). Allen v. Colvin, No. CA 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3, 2015) (citing Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996)). If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).

## III.   **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.[6]  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.       The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

---

[6] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite to one set of regulations only.  See id.

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 79 (1st Cir. 1982); 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### B.     Opinion Evidence

For applications like this one, filed on or after March 27, 2017, the SSA has fundamentally changed how adjudicators assess opinion evidence.  The familiar and longstanding requirements – that adjudicators must assign "controlling weight" to a well-supported treating source's medical opinion that is consistent with other evidence, and, if controlling weight is not given, must state the specific weight that is assigned – are gone.  20 C.F.R. § 404.1520c(a).  Instead, adjudicators "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."  Id.  Rather, an ALJ must consider the persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 404.1520c.  The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate.  20 C.F.R. § 404.1520c(b)(2); Jones v. Berryhill, 392 F. Supp. 3d 381, 839 (M.D. Tenn. 2019); Gorham v. Saul, Case No. 18-cv-853-SM, 2019 WL 3562689, at *5 (D.N.H. Aug. 6, 2019).  Supportability "includes an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or . . . medical finding is with other evidence in the claim."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5859 (Jan. 18, 2017).  Other factors that are weighed in light of all

of the evidence in the record includes the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding.  See 20 C.F.R. § 404.1520c(c)(1)-(5); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5859.  In other words, "[a] medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion."  Id. at 5854.

If the record contains "two or more medical opinions . . . about the same issue [that] are both equally well-supported . . . and consistent with the record," the ALJ's decision must articulate how the other persuasiveness factors were considered.  20 C.F.R. §§ 404.1520c(b)(3).  The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. § 404.1520b.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1520b(c)(3).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion.  See 20 C.F.R. §§ 404.1545-1546; see Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 793-94 (1st Cir. 1987) (per curiam).  The resolution of such conflicts in the evidence and the determination of disability is for the Commissioner.  See Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

## C.     Evaluation of Subjective Symptoms

When an ALJ decides to discount a claimant's subjective statements about the intensity, persistence and severity of symptoms, he must articulate specific and adequate reasons for doing so or the record must be obvious.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309-10 (D. Mass. 1998).  A reviewing

court will not disturb a clearly articulated finding supported by substantial evidence.  See Frustaglia, 829 F.2d at 195.  If proof of disability is based on subjective evidence so that the credibility determination is determinative, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding."  Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).  Guidance in evaluating the claimant's statements regarding the intensity, persistence, and limiting effects of subjective symptoms is provided by SSR 16-3p, 2017 WL 4790249, at *49462 (Oct. 25, 2017).  It directs the ALJ to consider the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; any other relevant evidence; and whether statements about the intensity, persistence, and limiting effects of symptoms are consistent with the medical signs and laboratory findings.  SSR 16-3p, 2017 WL 4790249, at *49465.

### D.    Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen v. Chater, 172 F.3d 31, 36 (1st Cir. 1991).  Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  SSR 16-3p, 2017 WL 4790249, at *49462; 20 C.F.R. § 404.1529(c)(3).  In determining whether the medical signs and laboratory findings show medical impairments that reasonably could be

expected to produce the pain alleged, the ALJ must consider the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors (e.g., movement, activity, environmental conditions); type, dosage, effectiveness, and adverse side-effects of any pain medication; treatment, other than medication, for relief of pain; functional restrictions; and the claimant's daily activities.  Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986); SSR 16-3p, 2017 WL 4790249, at *49465; Gullon v. Astrue, No. 11-cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I. Nov. 30, 2011).  An individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).  However, the individual's statements about the intensity, persistence, and limited effects of symptoms may not be disregarded "solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms."  SSR 16-3p, 2017 WL 4790249, at *49465.

If a treating physician finds that a patient's physical impairment is real, the physician may rely on the claimant's subjective statements regarding the impact of pain on the ability to function in opining to the  patient's RFC and the ALJ may not discount an otherwise well-founded opinion on that basis.  Ormon v. Astrue, 497 F. App'x 81, 85-86 (1st Cir. 2012).  "[T]he statements of the claimant and his doctor must be additive to clinical or laboratory findings" in considering pain's functional implications.  Avery, 797 F.2d at 21.  It is error for the ALJ to place "an extreme insistence on objective medical findings to corroborate subjective testimony of limitations of function because of pain."  Id. at 22

## IV.   **Analysis**

I begin with the mental health arguments Plaintiff has scattered through her briefs but has failed to develop as a coherent critique of the ALJ's decision, which accepts depression, anxiety and PTSD as severe impairments that resulted in significant limitations.  See Redondo-Borges v.

U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 6 (1st Cir. 2005) ("Few principles are more

sacrosanct in this circuit than the principle that 'issues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting

United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).  Apart from Nurse Practitioner

Lowney, who prescribed medication for anxiety, Plaintiff had no mental health treatment

throughout the period in issue.  While the Lowney treating records reflect that Plaintiff suffered

from distress and anxiousness (which caused the mental limitations the ALJ adopted and

incorporated into his RFC), they also reflect that the medication prescribed for anxiety was

having "good effect."  Tr. 356.  Further, it appears that Nurse Practitioner Lowney was not fully

aware of Plaintiff's mental health circumstances in that she mistakenly believed that Plaintiff

was seeing a "psych counselor."[7]  Tr. 380.  Moreover, the Lowney mental health opinion (Tr.

331-32) is not materially different from the opinions of the SA psychologists – indeed, the only

checked boxes on the Lowney mental health form that reflect greater limitations than what the

SA psychologists found either make no sense (marked limits in the ability to understand simple

instructions but only moderate limits in understanding detailed ones) or are utterly lacking in

record support (marked limits in the ability to get along with coworkers and peers and the ability

to maintain an appropriate appearance).  The ALJ's adoption of the significant limitations on

Plaintiff's ability to function mentally contained in the RFC opinions of SA experts Drs. Coyle

and Hamel is well supported by substantial evidence, untainted by error and should be affirmed

by the Court.

Plaintiff mounts a more substantive attack on the ALJ's findings regarding her physical

limitations; the decision accepts as severe only carpal tunnel syndrome, resulting in an RFC

---

[7] As observed *infra*, this is only one example of Nurse Practitioner Lowney's miscomprehension of Plaintiff's other
treatment, particularly her treatment with the specialists to whom Nurse Practitioner Lowney referred her.

permitting work at the medium exertional level, with additional manipulative (handling and feeling) limitations.

First, Plaintiff argues that the SA expert physicians' finding that Plaintiff could perform medium work (occasionally lift up to fifty pounds, frequently lift twenty-five pounds, and sit/stand/walk for six hours each) is not reasonable because there is no evidence in the record affirmatively to establish that Plaintiff retained that ability.  To support the argument, she contends that neither the SA non-examining physicians nor the ALJ cited to the record evidence on which they relied to conclude that Plaintiff was capable of what she contends are "truly extraordinary physical feat[s]."[8]  ECF No. 15-1 at 13.  This attack fails not only because the premise is wrong[9] but also because Plaintiff effectively is asking the Court to reweigh the evidence, with the burden shifted to the Commissioner.  See Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001) (claimant bears burden of production and persuasion at steps one through four of the sequential evaluation process).

The evidence of record establishes that Plaintiff had been performing work at the medium level or higher, when she stopped on October 1, 2017, and is replete with medically complex (to

---

[8] In the briefs, the parties spar over whether this characterization essentially is asking the Court to adopt a *per se* rule that it would be an "extraordinary physical feat" for a normal woman of fifty to perform medium work.  I have disregarded that inappropriate implication.

[9] Citing Richardson v. Perales, 402 U.S. 389 (1971), Plaintiff repeated accuses the non-examining physicians of citing "nothing in the evidence" to support their conclusions.  ECF No. 15-1 at 13-15.  This is simply wrong. Dr. Ramirez's opinion is followed by an "Additional Explanation" that specifically references the NeuroHealth findings (results of clinical tests, the brain MRI and the neurological examination), as well as the results of the clinical examination and x-rays performed by Dr. Reardon.  Tr. 68, 74; see Tr. 73 (manipulative limitations result from weakness and sensory deficit found on examination).  In concurring with the Ramirez assessment, Dr. Campo amplified this marshaling of the record, adverting specifically to the "electro-diagnostic evidence," coupled with "otherwise normal strength" and the absence of evidence of "thenar or hypo-thenar atrophy."  Tr. 86.  Plaintiff also is wrong in arguing that the ALJ failed to cite to the evidence of record on which he relied.  To the contrary, his fourteen-page decision contains a detailed and accurate survey of Plaintiff's statements regarding her symptoms, the treating record (including diagnoses, test results, x-rays, and examination findings), the consultative report and the opinion evidence.  Tr. 4-12.  This is more than sufficient to meet the standard set by Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

a lay person) test results and clinical observations that were interpreted by two qualified reviewing physicians, both of whom specifically referenced the treating records considered material to the analysis and found medium work (with additional limits) to be within Plaintiff's functional capacity.  Other than the troubling (for reasons discussed below) opinions signed by Nurse Practitioner Lowney, and Plaintiff's subjective statements, I agree that this record reflects relatively benign medical findings and ample evidence to support the ALJ's finding that Plaintiff's physical capacity is consistent with their opinions.

In passing, Plaintiff mentions that it would be error for the ALJ to rely on a reviewing expert who saw an incomplete record.  For starters, this is only a partial statement of the applicable principle of law, in that it is well settled that remand is required when "the state-agency physicians were not privy to parts of [plaintiff's] medical record [which] detracts from the weight that can be afforded their opinions."  Ruben M. v. Saul, C.A. No. 19-119MSM, 2020 WL 39037, at *9 (D.R.I. Jan. 3, 2020) (emphasis supplied), adopted, C.A. No. 1:19-CV-00119-MSM-PAS, 2020 WL 555186 (D.R.I. Feb. 4, 2020) (quoting Virgen C. v. Berryhill, C.A. No. 16-480 WES, 2018 WL 4693954, at *2-3 (D.R.I. Sept. 30, 2018)).  In this case, however, Plaintiff had no treatment after the SA physicians performed their file review.  And while there were missing treating records (summarized *supra*), these simply do not "detract from the weight" to be afforded to the opinions of the SA physicians.  Plaintiff does not argue otherwise.[10]  Nor could she – the missing records contain little more than negative test results, with findings that are entirely consistent with those appearing in the records that the SA physicians  reviewed, as the ALJ specifically found.

---

[10] Plaintiff introduced such an argument for the first time on reply, discussed *infra*.

As a bookend to her argument that reliance on the SA physicians was error, Plaintiff attacks the ALJ's finding that the three Lowney opinions related to physical limitations (one each for physical, pain and migraine) are unpersuasive. She argues that this determination is tainted by error, as well as that, because the SA physicians did not see the persuasive (according to Plaintiff) Lowney opinions, in reliance on Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006), it was error to rely on their RFC assessments.

The ALJ found that the Lowney opinions were unpersuasive because the limitations to which Nurse Practitioner Lowney opined were implausibly extreme yet she provided no explanation for them. Rather, her opinions are filled in on forms and are little more than a series of checked boxes. The ALJ further found that the Lowney opinions are unsupported by the medical evidence. Tr. 23.

These reasons are well supported.[11] First, the ALJ is right that the opinions amount to little more than box-checking, selecting the most extreme choice for virtually every question on each form. As clinical support[12] for such extreme opinions, Nurse Practitioner Lowney cites only to Dr. Zainah's records from November 16, 2017. Tr. 336 ("medical records by Ambulatory Services Pavillion done on 11-16-2017"); Tr. 337 (same). Yet the Zainah records do not support Nurse Practitioner Lowney's opinions because Dr. Zainah's tests were all negative, resulting in no diagnoses and no treatment. For diagnoses, Nurse Practitioner Lowney lists fibromyalgia, yet neither she nor any other qualified professional diagnosed fibromyalgia during the period in issue; she lists Crohn's disease, yet the ALJ correctly notes that Crohn's is

---

[11] Because the reasons supporting the ALJ's treatment of the Lowney opinions are not based on medical interpretation requiring medical expertise, I do not find that the ALJ made an impermissible medical judgment in finding them unpersuasive.

[12] Importantly, while her opinions were signed after the SA physician file review, Nurse Practitioner Lowney did not rely on post-SA file review examinations. Her opinions were signed almost six months after she last saw Plaintiff and five months after Dr. Campo signed his RFC. During this post-review period, Plaintiff had no treatment at all.

the subject of only limited medical evidence; and she lists bilateral carpal tunnel syndrome, which Dr. L'Europa  diagnosed, but the SA physicians endorsed this diagnosis and incorporated limitations based on Dr. L'Europa's testing into their RFC.  As to Nurse Practitioner Lowney's opinion that Plaintiff suffered from debilitating migraines, her own treating notes mention only that Plaintiff "is experiencing headaches" for which she was taking "Advil with good effect." Tr. 356.  Furthermore, Dr. Zainah's treating notes confirm that the current headaches are "not like migraines she used to have years ago," as well as that the headaches improved and then disappeared during the period when Dr. Zainah was involved with Plaintiff's case.  Tr. 393, 420. The other specialists to whom Plaintiff complained of headaches were the neurologists at NeuroHealth; but their brain MRI was normal and Plaintiff stated that the headaches were "not typical for her migraines," while migraines were mentioned only as past medical history and were not diagnosed in the period in issue.  Tr. 264.  When one considers that Nurse Practitioner Lowney opined (with no explanation and no clinical support) that Plaintiff has only a limited ability to see or hear, it is difficult to critique the ALJ's finding that the opinions "are so extreme as to appear implausible without further explanation."  Tr. 23, 336.  Indeed, Plaintiff herself concedes that it is her "consistent complaints" that formed the basis for Nurse Practitioner Lowney's opinions.  ECF No. 15-1 at 20.  Nurse Practitioner Lowney's own examinations are entirely normal (except for the rash); she was relying on the specialists, as her treatment plan makes clear.

At bottom, the ALJ examined opinions from two SA expert physicians that are firmly grounded in the evidence, and the opinions of a nurse practitioner that are unsupported by the medical record.  He had well-founded reasons for finding the former persuasive and the latter less so.  I find no error in any aspect of his analysis.  See Purdy, 887 F.3d at 13 ("if a reasonable

mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [ALJ's] conclusion," Commissioner's decision must be affirmed).

Plaintiff's final argument is that the ALJ made improper credibility determinations in that he implausibly found the SA opinions more "credible" than Plaintiff's complaints of pain, anxiety and depression.  In support of this argument, she points, for example, to Nurse Practitioner Lowney's reference to a diagnosis of "toxic neuropathy" caused by the pesticide she used for several months on her marijuana plants.  However, a careful read of the evidence reveals that Nurse Practitioner Lowney was mistaken when she repeatedly noted a diagnosis of toxic neuropathy.[13]  The record reveals that the specialists considered but none diagnosed or treated toxic neuropathy.  Tr. 264 (infectious disease specialist "[q]uestioned chemical neuropathy"); Tr. 266 ("? Toxic neuropathy"); Tr. 394 ("pesticide exposure does not explain the clinical picture"). The accuracy gap between Plaintiff's statements to Nurse Practitioner Lowney, which the latter accepted and recorded as fact, and the reality reflected in the specialists' records, is also illustrated by Nurse Practitioner Lowney's note of May 22, 2018, which records that "she also has a psych counselor," Tr. 380, while the only mental health specialist Plaintiff saw was the SA consulting psychologist, Dr. Turchetta.  Tr. 320-23.  Having reviewed the record exhaustively, I find that the ALJ got it right – he properly relied on a record that is replete with instances of reports of severe symptoms that are inconsistent with the objective clinical evidence, which is relatively benign.  The ALJ's treatment of these statements is not an improper "credibility" finding but rather is an error-free determination based on substantial evidence in accordance with SSR 16-3p.

---

[13] The Lowney treating notes indicate: "[s]tates she has been seeing an infectious disease specialist who has diagnosed her with toxic neuropathy," Tr. 364; "[s]he continues to be followed by Dr Brescher [sic] (neuro) R/T Toxic neuropathy," Tr. 368; and "[s]tates she is still being followed by neurologist Dr L Europa for toxic neuropathy," Tr. 372.

The Court cannot ignore that Plaintiff's "credibility" argument boils down to a frontal attack on ALJ Mastrangelo. She contends that he "impugned" her character by "questioning her credibility, rather than the consistency of her statements." ECF No. 15-1 at 20. This argument seems to be based on Plaintiff's misinterpretation of the word – "belie" – that was appropriately used by the ALJ to highlight the inconsistency between her activities of daily living/functioning and her statements regarding the severity of her symptoms. Tr. 20. Having read and reread ALJ Mastrangelo's decision, the Court finds no hint of a nefarious impugning of Plaintiff's character.[14] The ALJ's evaluation of Plaintiff's subjective complaints is amply supported by substantial evidence and not tainted by any error.

On reply, Plaintiff shifts course to argue that reliance on the SA physicians was error because the file lacked the Zainah records from November/December 2017, the RIH record reflecting the November 7, 2017, emergency room visit, and Nurse Practitioner Lowney's last treating record from May 22, 2018, none of which had been timely submitted. This argument comes too late. DRI LR Cv 7(a)(4) (reply shall not present arguments not made in support of motion); cf. Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 40 (1st Cir. 1990)

---

[14] While the issue is moot if the Court adopts my recommendation that remand is not necessary, I note that this is at least the third case in which a claimant represented by the same attorney has asked the Court to order that, if remand is ordered, the matter should be assigned to an ALJ other than ALJ Mastrangelo. E.g., Andrea T. v. Saul, C.A. No. 19-505WES, 2020 WL 2115898, at *7 & n.8 (D.R.I. May 4, 2020), adopted by Text Order of June 5, 2020; see Sacilowski v. Saul, No. 19-1712, 2020 WL 2508018, at *4 (1st Cir. May 15, 2020) (request that court should reassign case to different ALJ moot because award of benefits affirmed). The reason for the request for reassignment is the attorney's perception of unspecified bias against him in another case, which he claims has permeated ALJ Mastrangelo's approach to this case. To the extent that the request is focused on bias against Plaintiff herself, the request for reassignment is insufficiently supported. See Peck v. Colvin, Civil Action No. 12-40146-DHH, 2014 WL 1056988, at *5 (D. Mass. Mar. 14, 2014) (plaintiff must show that ALJ's behavior was so extreme as to display clear inability to render fair judgment); Strout v. Astrue, Civil No. 08-181-B-W, 2009 WL 214576, at *5 (D. Me. Jan. 28, 2009) (hurdle to rebut presumption of adjudicator's impartiality is high). Despite my detailed review of the record in light of the ALJ's conduct at the hearing and the content of his decision, I found nothing suggesting bias against Plaintiff in this case. With nothing in this record to explain the problem between the attorney and this ALJ, the request for reassignment is also insufficient to the extent that it is based on bias against her attorney. See Ocasio v. Barnhart, No. 00 CV 6277 (SJ), 2002 WL 485691, at *10 (E.D.N.Y. Mar. 28, 2002) (reassignment ordered due to on-the-record complaints reflecting animosity between ALJ and plaintiff's attorney). Therefore, if it becomes pertinent, I do not recommend a reassignment order interfering with the Commissioner's usual assignment procedures pursuant to HALLEX, I-2-1-55D.

(appellant waives any issue not adequately raised in initial brief; appellee entitled to rely on content of appellant's brief for scope of the issues appealed). Even if the argument had been timely presented, it should fail because, as the ALJ correctly notes, these records are entirely consistent with contemporaneous records[15] that the SA physicians reviewed. See Andrea T. v. Saul, C.A. No. 19-505WES, 2020 WL 2115898, at *6 (D.R.I. May 4, 2020) (to render an SSA opinion irrelevant merely because expert was not privy to every medical record "would defy logic and be a formula for paralysis") (citing Kendrick v. Shalala, 998 F.2d 455, 456-57 (7th Cir. 1993)). Moreover, far from advancing Plaintiff's cause, the Zainah and RIH records corroborate the ALJ's finding regarding the consistency gap between Plaintiff's subjective statements about her symptoms and the objective evidence. Just two examples suffice to illustrate. First, Plaintiff told Dr. Zainah that she had suffered from a high fever over a protracted period, yet the treating records from the precise period when she said the fever was occurring lack a single reference to an elevated fever and Dr. Zainah never observed an elevated fever despite two in-person appointments and four telephone calls to check whether Plaintiff had a fever. Second, on November 7, 2017, Plaintiff told RIH staff that she had been sent to the emergency room by Nurse Practitioner Lowney due to shortness of breath and chest pain, yet Nurse Practitioner Lowney's treating note from the same day makes no mention either of these serious symptoms or of any suggestion that Plaintiff should go to the emergency room. Moreover, the RIH staff's observation was that Plaintiff did not have any such symptoms. Tr. 433. She was sent home as "stable." Tr. 431. Similarly, the last Lowney note, from May 22, 2018, is virtually the same as the one from April 2018, which the SA physicians reviewed. In addition, it underscores the flaws that permeate the Lowney opinions signed six months later in that it reflects Nurse

---

[15] Further, the Zainah records are summarized in the NeuroHealth note of December 14, 2017, which was part of the file reviewed by the SA physicians. Tr. 264.

Practitioner Lowney's ongoing misunderstanding of the diagnoses and treatment being provided by the specialists, yet, her "plan" was that Plaintiff should "follow up" with these specialists; her own examination was normal; and she otherwise recommended only a routine follow-up in six months.  Tr. 380-83.

The outcome of this case should turn on the reality that this Court is not empowered to consider Plaintiff's application *de novo*, nor may it undertake an independent assessment of whether she is disabled under the Act.  Rather, the Court is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Gorham, 2019 WL 3562689, at *8 (citing Nguyen, 172 F.3d at 35).  When the ALJ's findings are properly supported by substantial evidence – as they are in this case – the Court must sustain those findings even when there may also be substantial evidence supporting the contrary position.  See, e.g., Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988) ("[W]e must uphold the [Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."); Rodriguez, 647 F.2d at 222 ("We must uphold the [Commissioner's] findings in this case if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.").

## V.   <u>Conclusion</u>

Based on the foregoing analysis, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 15) be DENIED and Defendant's Motion for Entry of an Order Affirming the Decision of the Commissioner (ECF No. 16) be GRANTED.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  <u>See</u>

Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner

constitutes waiver of the right to review by the district judge and the right to appeal the Court's

decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart,

Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
June 25, 2020